UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JULIA RELLOU,

                            Plaintiff,

        -v-

JP MORGAN CHASE LONG-TERM DISABILITY
PLAN, DIRECTOR OF HUMAN RESOURCES, JP
MORGAN CHASE & CO., as Plan Administrator and
Fiduciary, and FIRST UNUM LIFE INSURANCE
COMPANY, as Fiduciary,

                           Defendants.

Case No. 07-CV-1334 (KMK)

OPINION AND ORDER

Appearances:

William D. Frumkin, Esq.
Sapir & Frumkin LLP
White Plains, NY
*Counsel for Plaintiff*

Philip A. Goldstein, Esq.
Stacey L. Blecher, Esq.
J.P. Morgan Chase & Co.
New York, NY
*Counsel for JPMC Defendants*

Patrick W. Begos, Esq.
Begos & Horgan LLP
Westport, CT
*Counsel for Defendant First Unum*

KENNETH M. KARAS, District Judge:

       Julia Rellou ("Plaintiff"), a former employee of JP Morgan Chase ("JPMC"), filed this

action against the JP Morgan Chase Long-Term Disability Plan (the "Plan") and "Director of

Human Resources, JP Morgan Chase & Co." ("JPMC HR Director") (together, the "JPMC

Defendants"),[1] as well as First Unum Life Insurance Company ("First Unum"),[2] pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, "for failure to provide long-term disability benefits in the form provided for in all relevant Summary Plan Description documents, and for breach of fiduciary duty and promissory estoppel." (Second Am. Compl. ("SAC") ¶ 1.)  The JPMC Defendants and First Unum have filed separate motions for summary judgment, and also for attorneys' fees.  For the reasons stated herein, the motions for summary judgment are granted, and the motions for attorneys' fees are denied.

I.  Background

A.  The Plan and Policy

Plaintiff began participating in the Plan in or about 1988.  (First Unum's Rule 56.1 Statement ("First Unum 56.1") ¶ 1.)  Beginning no later than January 1, 1997, the Plan provided that any long-term disability ("LTD") benefits payable under the Plan would be reduced by Social Security Disability Insurance ("SSDI") benefits awarded to a beneficiary or to a beneficiary's children.  (*Id.* ¶ 2.)  JPMC issued to its employees a Summary Plan Description effective January 1, 1997 ("1997 SPD"), which stated that "[LTD] benefits are reduced by

---

[1] The JPMC Defendants apparently interpret the Second Amended Complaint, which is somewhat ambiguously worded, to name *three* separate JPMC-affiliated Defendants:  "[1] JPMorgan Chase Long-Term Disability Plan, [2] Director of Human Resources and [3] JPMorgan Chase & Co."  (JPMC Defs.' Mem. in Supp. of Mot. for Summ. J. ("JPMC Mem.") 1.)  However, the original summons in this case, dated February 22, 2007, clearly identifies the Plan and the JPMC HR Director as the two JPMC Defendants (Decl. of Patrick W. Begos in Supp. of First Unum's Mot. for Summ. J. ("Begos Decl.") Ex. F), and the Second Amended Complaint's section identifying the Parties also indicates two JPMC Defendants (Second Am. Compl. ("SAC") ¶¶ 6-7).  In any event, the potential existence of a third JPMC Defendant would have no bearing on the disposition of these motions.

[2] Plaintiff's Second Amended Complaint named "Unum Provident" as a defendant.  On May 11, 2007, the Parties stipulated to the substitution of First Unum.

2

certain 'other income benefits,'" and that "[e]xamples of 'other income benefits' are benefits provided by . . . United States Social Security . . . (including family benefits), either disability or regular." (*Id.* ¶ 3.)

Pursuant to the terms of a group disability policy issued to JPMC effective January 1, 2002 (the "Policy"), First Unum began insuring LTD benefits payable by the Plan. (*Id.* ¶ 5.) The Policy gives First Unum "the broadest discretion permissible under ERISA and any other applicable laws" to determine claims. (*Id.* ¶ 6.) The Policy provides that First Unum "will subtract from your gross disability payment . . . [t]he amount that you, your spouse and your children receive as disability payments because of your disability under . . . the United States Social Security Act." (*Id.* ¶ 8.)

B.  Plaintiff's LTD Claim

Plaintiff submitted a claim for LTD benefits in 2002. (*Id.* ¶ 4.)  Before Plaintiff qualified for LTD benefits, she had received copies of the 1997 SPD and the Policy. (*Id.* ¶¶ 4, 12-16.)  By letter dated October 26, 2002, Plaintiff asked JPMC for "the disability Plan document," stating that if she did not receive "the current Plan document," she would "complete [her] application [for LTD benefits] based on the Plan document [she] ha[d] in [her] possession, with an effective date of January 1, 1997," i.e., the 1997 SPD.  (Begos Decl., unnumbered Ex. (Administrative R. ("R.")), at 266.)  JPMC responded by letter of December 23, 2002, stating that the new SPD was not yet ready for distribution, but enclosing several other documents, including the "[P]olicy" and a "2002 Resource Guide which served as a Summary of Material Modification." (R. 267.)  The 2002 Resource Guide states:  "This guide modifies and changes the summary plan descriptions previously distributed to you." (Aff. of Julia Rellou in Opp'n to Mot. for Summ. J.

3

("Pl. Aff.") Ex. A (2002 Resource Guide), at second unnumbered page.)  Under the heading

"Coordination With Social Security," the 2002 Resource Guide further states:  "Under the terms

of the LTD Plan, you must apply for Social Security disability benefits.  If your application is

approved, your benefits from the LTD Plan generally will be reduced by the amount of Social

Security disability benefits you receive."  (R. 271.)

First Unum began paying Plaintiff LTD benefits in February 2003.  (First Unum 56.1

¶ 17.)  By letter dated May 2, 2003, First Unum informed Plaintiff that she was required to file

for SSDI benefits (R. 571), quoted the Policy language (quoted above, *see supra* Section I.A)

stating that First Unum "*will subtract from your gross disability payment . . . [t]he amount that*

*you, your spouse and your children receive as disability payments because of your disability*

*under . . . the United States Social Security Act*" (First Unum 56.1 ¶ 18), and stated that First

Unum "would agree not to deduct estimated SSDI Benefits 'provided [plaintiff] agree[s] to repay

[First Unum] in full for any monies advanced to [her] while [her] SSDI claim is being

evaluated'" (*id.* ¶ 19 (alterations in original)).  Plaintiff subsequently elected "Option B" of a

"Reimbursement Agreement" sent to her by First Unum, thereby "making the following

representations and promises" (*id.* ¶ 21):

> The policy under which I am covered provides that my disability benefits may be
> reduced by other benefits that I (my spouse and dependents, if applicable) may
> receive or are eligible to receive under . . . Social Security Administration
> benefits[.]
>
> . . . .
>
> Please pay me the disability benefit with no reduction for amounts received by
> other sources until a final determination of my eligibility to receive those benefits
> is made.  I understand that this may result in an overpayment by the Insurer.  I
> agree to notify the Insurer within 48 hours of receiving notice of any and all
> decisions, to supply the Insurer with a copy of the final decision, and to repay any

4

overpayment incurred as a result of receiving any other benefits from those sources specified in the policy.

*. . . I understand that the Insurer has agreed to pay me an unreduced benefit based upon my written promise herein to pay the Insurer any overpayment resulting from my receipt of benefits from other sources, as outlined in my policy. I agree to reimburse the Insurer any such overpayment within thirty (30) days of my receipt of such funds.*

If I fail to pay the Insurer the overpayment within the thirty (30) day period specified above, I understand that the Insurer may reduce future payments under the policy in order to recover the overpaid benefits.

(*Id.*)  According to Plaintiff, she "did not believe this family offset applied to [her] when [she] signed the Reimbursement Agreement."  (Pl. Aff. ¶ 9.)  This belief was "[b]ased on the ambiguity of the [Reimbursement Agreement] and [Plaintiff's] reading of the 2002 Resource Guide."  (*Id.*)

C.  Plaintiff's Claim for SSDI Benefits

By letter of October 20, 2004, First Unum informed Plaintiff that the firm it retained to assist Plaintiff in applying for SSDI benefits had concluded that Plaintiff "may not be eligible" for such benefits and thus "closed the handling of [Plaintiff's] claim."  (R. 533.)  The letter stated that Plaintiff was "under no further contractual obligation to apply" for SSDI benefits, but noted that Plaintiff could do so on her own if she chose, and asked her to "keep [First Unum] informed of any decisions the Social Security Administration makes regarding [her] benefits."  (*Id.*)  Thereafter, Plaintiff did apply for SSDI benefits; according to Plaintiff, she would not have done so "if [she] had known that [her] benefits under the Plan would be reduced by the amount of the SSDI awarded to [her] children."  (Pl. Aff. ¶ 21; *id.* ¶ 13 (stating that Plaintiff pursued a claim for SSDI benefits "in reliance o[n] the [2002 Resource Guide] which indicated only benefits [she] received would be offset").)

5

On May 31, 2005, Plaintiff received an SSDI award, with payments retroactive to December 2003.  (First Unum 56.1 ¶ 23.)  Plaintiff was notified by letter that around June 6, 2005, she would receive $36,612 owed to her for December 2003 through May 2005, and that she would subsequently receive $2,070 each month.  (R. 416.)  According to Plaintiff, on or about September 25, 2005, she was awarded additional SSDI benefits for her children.  (Pl. Aff. ¶ 13.)  In a "Claimant's Supplemental Statement" dated January 26, 2006, Plaintiff disclosed to First Unum for the first time that she had received an SSDI award, stating that she was receiving a $2,070 monthly award beginning in June 2005.  (First Unum 56.1 ¶¶ 24-25; R. 475.)

First Unum informed SSA that it had "received a request for disability benefits from [Plaintiff]," and requested that SSA fill out a form indicating "the entitlement date and the monthly amount for both Primary and Dependent Social Security benefits."  (R. 422.)  SSA returned the form to First Unum after indicating the following information:  Plaintiff had been given a "Disability" award; as of December 2003, she was entitled $2,016.10 per month in "Primary" SSDI benefits and $504.00 per month in SSDI benefits for "Dependents"; as of December 2004, these monthly amounts increased to $2,070.50 and $517.60, respectively; as of December 2005, they increased to $2,155.30 and $538.90, respectively; and each increase was due to a cost-of-living adjustment ("COLA").  (*Id.*)

D.  Offset of Plaintiff's SSDI Benefits

By letter to Plaintiff dated March 9, 2006, First Unum requested that Plaintiff submit "a copy of [her] original Social Security *Notice of Award* letter, which includes the entitlement date and amount for both [her]self and any eligible dependents."  (R. 454.)  The letter further stated: "Because you are receiving SSDI benefits, there may be an overpayment or underpayment [of

LTD benefits].  As soon as we review this information, we will let you know the amount of any adjustments needed and the new amount of your future benefits."  (*Id.*)  By letter of March 30, 2006, First Unum informed Plaintiff that, due to the SSDI awards, First Unum had overpaid Plaintiff by $82,454.40, and demanded that Plaintiff repay that amount, pursuant to the terms of the Policy and the Reimbursement Agreement, by April 30, 2006.  (First Unum 56.1 ¶¶ 28-29; R. 428.)

By letter of March 31, 2006, Plaintiff responded to First Unum's March 9 letter,[3] stating that the potential "offset of [her] children's Social Security benefit . . . prompt[ed] [her] to seek legal advice."  (R. 417.)  Plaintiff stated her view that "attaching children's benefits is . . . an unlawful practice due to the lack of notice," on grounds that "in the Summary Plan Document [sic], *nothing* is stated about an offset of Social Security disability benefits to a disabled employee's children."  (*Id.*)  According to Plaintiff, "[w]hen [she] elected Long-Term Disability coverage from [her] employer, [she] had no knowledge of requirements other than those included in the Summary Plan Document [sic]" and "relied on the Summary Plan Document [sic] to [her] detriment."  (*Id.*)  Plaintiff requested to be "inform[ed] how [First] Unum intends to proceed." (*Id.*)

By letter dated April 27, 2006, First Unum acknowledged receipt of Plaintiff's March 31 letter, noted that it had not received the reimbursement demanded in its March 30 letter, and stated that "it would apply [Plaintiff's] monthly benefit toward the overpayment until the overpayment had been repaid in full."  (R. 407-08; First Unum 56.1 ¶ 31.)

---

[3] Plaintiff's March 31 letter made reference only to First Unum's letter of March 9; apparently Plaintiff sent the letter prior to her receipt of First Unum's March 30 letter.  (R. 417.)

By letter to Plaintiff's current counsel, dated September 18, 2006, First Unum stated that Plaintiff's notice of the terms of the Policy and Reimbursement Agreement dictated that Plaintiff "was adequately informed of th[e] fact that her Long Term Disability benefits could be reduced by th[e] amounts payable to her children." (R. 334-35.) The letter further stated First Unum's position that governing law did not "preclude [First] Unum from reducing [Plaintiff's] Long Term Disability benefit to recover overpaid benefits." (R. 334.) Through current counsel, Plaintiff administratively appealed First Unum's decision to apply Plaintiff's monthly benefit toward the overpayment, and First Unum upheld its previous determination. (First Unum 56.1 ¶¶ 34-35.)

E. Procedural History

Plaintiff filed suit in this Court on February 22, 2007, and filed an Amended Complaint on March 30, 2007. The case was assigned to this Court on August 6, 2007. Plaintiff filed a Second Amended Complaint on August 4, 2008. The Second Amended Complaint alleges that "the Plan acted in violation of its terms when it stopped paying Plaintiff benefits to recoup the alleged overpayment," in violation of ERISA (SAC ¶ 31); that "[JPMC] and [First] Unum breached their fiduciary duties to Plaintiff when they failed to provide adequate notice of . . . the offset of dependent benefits," in violation of ERISA (*id.* ¶ 34); that "Plaintiff reasonably and detrimentally relied on Defendants' misrepresentations by appealing the denial of her children's Social Security benefits," rendering Defendants "liable in promissory estoppel pursuant to the federal common law of ERISA" (*id.* ¶¶ 38, 40); and that Defendants, by offsetting Plaintiff's benefits, violated ERISA because "such money damages are not collectable under this or any section of ERISA" (*id.* ¶ 43). Plaintiff seeks, inter alia, "recoupment" of benefits owed to her,

8

"future long-term disability benefits unreduced by the amount of her children's Social Security benefits," and declaratory relief. (*Id.* ¶¶ 32, 35, 44.)

On December 17, 2008, First Unum moved for summary judgment. On December 19, 2008, the JPMC Defendants moved for summary judgment.[4] All Defendants also seek attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1), claiming that Plaintiff acted in bad faith in bringing this lawsuit.

## II.  Discussion

### A.  Standards of Review

#### 1.  Summary Judgment

Summary judgment may be granted when it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with

---

[4] The JPMC Defendants' motion for summary judgment and for attorneys' fees principally adopts the arguments made by First Unum. (JPMC Mem. 1.)

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations

omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do

more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted);

*see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006)

("[S]peculation alone is insufficient to defeat a motion for summary judgment.").

### 2.  Denial of ERISA Plan Benefits

"Principles of trust law require courts to review a denial of [ERISA] plan benefits under a

*de novo* standard unless the plan provides to the contrary."  *Metro. Life Ins. Co. v. Glenn*, 128 S.

Ct. 2343, 2348 (2008) (internal quotation marks omitted).  "Where the plan provides to the

contrary by granting the administrator or fiduciary *discretionary authority* to determine

eligibility for benefits, [t]rust principles make a *deferential standard* of review appropriate."  *Id.*

(internal citations and quotation marks omitted) (alteration in original); *see also McCauley v.*

*First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008) ("[W]here the plan grants the

administrator discretionary authority to determine eligibility benefits, a deferential standard of

review is appropriate.  Under the deferential standard, a court may not overturn the

administrator's denial of benefits unless its actions are found to be arbitrary and capricious,

meaning without reason, unsupported by substantial evidence or erroneous as a matter of law."

(internal citation and quotation marks omitted)).

"If a benefit plan gives discretion to an administrator or fiduciary who *is operating under*

*a conflict of interest*, that conflict must be *weighed as a factor* in determining whether there is an

abuse of discretion." *Glenn*, 128 S. Ct. at 2348 (internal quotation marks omitted).  Where "the

entity that administers the plan . . . both determines whether an employee is eligible for benefits

and pays benefits out of its own pocket[,] . . . this dual role creates a conflict of interest." *Id.* at

2346.  "[A] reviewing court should consider that conflict as a factor in determining whether the

plan administrator has abused its discretion in denying benefits; and . . . the significance of the

factor will depend upon the circumstances of the particular case." *Id.*

    B.  Section 1132(a)(1)(B) Claim for LTD Benefits

    Plaintiff claims that "the Plan acted in violation of its terms when it stopped paying

Plaintiff [LTD] benefits to recoup the alleged overpayment in violation of ERISA, 29 U.S.C.

§ 1132(a)(1)(B)."  (SAC ¶ 31.)  She essentially contends that the Plan was modified to permit

her to receive LTD benefits unreduced by SSDI benefits paid to her children, and that the

Reimbursement Agreement she signed therefore did not actually authorize First Unum to

"reduce future payments . . . in order to recover the overpaid benefits."

    Under ERISA, "[a] civil action may be brought . . . by a participant or beneficiary . . . to

recover benefits due to [her] under the terms of his plan, to enforce [her] rights under the terms

of the plan, or to clarify [her] rights to future benefits under the terms of the plan."  29 U.S.C.

§ 1132(a)(1)(B).  Section 1132(a)(1)(B) "provides contractual relief to individual beneficiaries."

*Dobson v. Hartford Fin. Servs. Group, Inc.*, 389 F.3d 386, 397 (2d Cir. 2004).  "In claims under

[Section 1132(a)(1)(B), courts] apply federal common law . . . in interpreting the beneficiary's

entitlements."  *Lifson v. INA Life Ins. Co.*, 333 F.3d 349, 352 (2d Cir. 2003).  "[Courts] apply

familiar rules of contract interpretation in reading an ERISA plan."  *Id.* at 353.  "[U]nambiguous

language in an ERISA plan must be interpreted and enforced in accordance with its plain

meaning.  Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."  *Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578-79 (2d Cir. 2006) (internal quotation marks omitted) (alteration in *Gibbs*).  "Where contract language is ambiguous, summary judgment is not appropriate," except that "a court may look to extrinsic evidence to resolve ambiguity in an ERISA plan, but only when the extrinsic evidence is itself unambiguous."  *Eastman Kodak Co. v. Bayer Corp.*, 576 F. Supp. 2d 548, 550 & n.2 (S.D.N.Y. 2008), *aff'd sub nom. Eastman Kodak Co. v. STWB Inc.*, No. 08-4722, 2009 WL 2767021 (2d Cir. Sept. 2, 2009) (summ. order).  "Whether language is ambiguous is a question of law to be resolved by reference to the contract alone."  *Id.* at 551.

The Policy at issue here gives First Unum "the broadest discretion permissible under ERISA and any other applicable laws" to determine Plaintiff's claim (First Unum 56.1 ¶ 6), i.e., to determine whether First Unum was entitled to offset the SSDI benefits that Plaintiff received for her dependents against Plaintiff's LTD benefits under the Plan.  There can be no dispute that this language in the Policy constituted a clear reservation of discretion sufficient to defeat the presumption of de novo review; thus, this Court reviews First Unum's determination for abuse of discretion.  *See Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d Cir. 2008) (noting the requirement that reservations of discretion must be clear).  It bears noting, however, that the result here would be the same even under a de novo standard.

There is no evidence in the record from which a reasonable factfinder could conclude that First Unum abused its discretion in determining that Plaintiff was not entitled, under the Plan, to receive LTD benefits unreduced by the amount of her SSDI family benefits.  The 1997 SPD and

the Policy, both of which Plaintiff had admittedly received prior to her applications for LTD and

SSDI benefits, clearly state that all SSDI benefits — both for beneficiaries and for their "family"

or "dependents" — are subtracted from LTD benefits.  Plaintiff does not argue that these

documents contain any ambiguities.  Instead, Plaintiff argues that the 2002 Resource Guide

modified the terms of the Plan by stating that "your benefits from the LTD Plan generally will be

reduced by the amount of Social Security disability benefits you receive."  Plaintiff emphasizes

the word "you" in this statement.  (Pl.'s Mem. in Opp'n to Mot. for Summ. J. ("Pl.'s Mem.") 2,

10.)  She contends:  "'You' does not mean [Plaintiff's] children.  This is what the Plan stated and

in refusing to abide by it, [First] Unum has acted in contravention of the Plan and has violated

ERISA's benefit claim provision."  (*Id.* 10.)

      First Unum did not abuse its discretion in rejecting this argument.  The 2002 Resource

Guide's statement relied upon by Plaintiff, by its plain language, does not *limit* the reduction of

benefits; it merely states *affirmatively* that LTD benefits "generally" will be reduced by the

beneficiary's SSDI benefits.  The absence of specific reference to SSDI family benefits thus

could not plausibly be interpreted to modify the 1997 SPD's statement that "[LTD] benefits are

reduced by . . . [SSDI] family benefits" or the Policy's statement that First Unum "*will subtract

from your gross disability payment . . . [t]he amount that . . . your children receive as [SSDI

benefits]*."  Plaintiff's contention that she reasonably believed that the Plan had been so modified

is particularly dubious in light of the fact that JPMC sent her the Policy together with the 2002

Resource Guide in December 2002, and that First Unum subsequently quoted the relevant

language from the Policy in its May 3, 2003 letter to Plaintiff, which explicitly informed Plaintiff

that any LTD benefits to which she might be entitled would be reduced by SSDI benefits

awarded to her and her children.  In any event, there is no genuine issue of material fact as to whether First Unum acted within its discretion in concluding that the Plan had not been modified with respect to offset of family SSDI benefits.

Thus, as a matter of law, First Unum also did not abuse its discretion when it enforced Plaintiff's election of "Option B" of the Reimbursement Agreement (in which Plaintiff specifically acknowledged that her LTD benefits could be reduced by SSDI benefits granted to her dependents) and reduced her future LTD payments in order to recover the overpaid benefits received by Plaintiff on account of SSDI benefits paid to her and her dependents.  Plaintiff emphasizes the words "if applicable" in the Reimbursement Agreement, contending that she did not believe that the offset of SSDI family benefits "applied to [her]."  (Pl. Aff. ¶ 9; Pl.'s Mem. 3.)[5]  Because Plaintiff's only proffered basis for believing that the offset provision was not applicable to her SSDI family benefits was the 2002 Resource Guide's statement discussed above, the same reasons noted above dictate that it was not unreasonable for First Unum to enforce the Reimbursement Agreement as it did.[6]

The Court reaches this conclusion after noting First Unum's conflict of interest — since

---

[5] Plaintiff's "belief" that the words "if applicable" mean that the family benefits offset only governs "if applicable" to certain beneficiaries is facially unsupportable.  The phrase "if applicable" describes situations where the beneficiary receives SSDI benefits for a spouse or children.  In other words, the "if applicable" language does not mean, or even suggest, that there are different SSDI offset provisions for different LTD policies.  Instead, there is only one provision regarding SSDI offsets that requires SSDI offsets for family benefits, if the beneficiary is awarded such benefits.

[6] Plaintiff separately asserts that "Defendants' offset of Plaintiff's benefits . . . is in violation of [29 U.S.C. § 1132(a)(3)] in that such money damages are not collectable under this or any section of ERISA."  (SAC ¶ 43.)  As Defendants are not presently seeking to collect money damages in this lawsuit, the Court need not address this argument.

First Unum both judged the merits of Plaintiff's appeal and paid her LTD benefits — and weighing that conflict as a factor in determining whether First Unum abused its discretion.  As noted above, Plaintiff's contention that the 2002 Resource Guide modified the Plan to eliminate the offset of SSDI family benefits is contrary to the plain language of the documents, and it is therefore evident that the existence of First Unum's conflict of interest is not sufficient to permit a finding of abuse of discretion.  *See Kellner v. First Unum Life Ins. Co.*, 589 F. Supp. 2d 291, 311 (S.D.N.Y. 2008) ("[T]he other factors bearing on Defendant's denial of benefits do not result in a close question for which the conflict of interest might serve as a 'tiebreaker' in the Court's decision.").[7]

Accordingly, Defendants are entitled to summary judgment as to Plaintiff's Section 1132(a)(1)(B) claim.

### C.  Breach of Fiduciary Duty Claim

Plaintiff claims that Defendants "breached their fiduciary duties to Plaintiff when they failed to provide adequate notice of the material change (the offset of dependent benefits) to the

---

[7] The Court likewise rejects Plaintiff's argument that she "must be allowed to conduct additional discovery to determine what role [First Unum's] conflict [of interest] played" in its determination of her claim (Pl.'s Mem. 9), as Plaintiff has failed to provide a proper basis for such an argument, *see* Fed. R. Civ. P. 56(f).  "To oppose a motion on the basis of Rule 56(f), a party must file an affidavit detailing:  (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why these efforts were unsuccessful." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 606 (2d Cir. 2005).  Plaintiff has not filed a Rule 56(f) affidavit, and has not explained in any of her submissions to this Court what efforts she has made to obtain discovery relating to First Unum's conflict of interest or why such efforts were unsuccessful.  *See Kellner*, 589 F. Supp. 2d at 304-05.  Moreover, even assuming arguendo that additional discovery revealed facts showing that First Unum's conflict of interest strongly influenced its decision to deny Plaintiff's claim, such a showing would not create a genuine issue of fact as to the reasonableness of that decision, as that decision was independently dictated by the plain meaning of the Plan documents.

2002 Resource Guide . . . , in violation of 29 U.S.C. §[§] 1104(a) and 1132(a)(3)."  (SAC ¶ 34.)

According to Plaintiff, she "was not informed that the 2002 Resource Guide was changed to

include the offset of her children's benefits before she [applied for SSDI benefits]" (Pl.'s Mem.

13), and this constituted a material omission on which Plaintiff relied to her detriment.

Under ERISA, "a fiduciary shall discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries; . . . for the exclusive purpose of . . . providing

benefits to participants and their beneficiaries; . . . with the care, skill, prudence, and diligence

under the circumstances then prevailing that a prudent man acting in a like capacity and familiar

with such matters would use in the conduct of an enterprise of a like character and with like

aims; . . . and . . . in accordance with the documents and instruments governing the plan."  29

U.S.C. § 1104(a)(1).  "A civil action may be brought . . . by a participant, beneficiary, or

fiduciary . . . to enjoin any act or practice which violates any provision of this subchapter or the

terms of the plan, or . . . to obtain other appropriate equitable relief . . . to redress such violations

or . . . to enforce any provisions of this subchapter or the terms of the plan . . . ."  *Id.*

§ 1132(a)(3).

"To establish a breach of fiduciary duty based on alleged misrepresentations about

coverage under an ERISA plan, Plaintiff must show that (1) Defendants were acting in a

fiduciary capacity and that (2) they made a material misrepresentation or omission (3) on which

Plaintiff relied to her detriment."  *Bell v. Pfizer Inc.*, 499 F. Supp. 2d 404, 410 (S.D.N.Y. 2007).

For the reasons described above, *see supra* Section II.B, Plaintiff has not adduced

evidence establishing a genuine issue of material fact as to whether any of the Defendants made

a material misrepresentation or omission.  Because the 2002 Resource Guide did not change the

16

Plan's policy of reducing LTD benefits by the amount of SSDI family benefits awarded, there was no reason for Defendants to tell Plaintiff that the Plan was changing *back*; there was no new information, and thus nothing for Defendants to omit.

Even assuming that there was a material misrepresentation or omission in the 2002 Resource Guide, there is no evidence in the record from which a factfinder could conclude that Plaintiff relied on Defendants' statements to her *detriment*.[8]  Plaintiff asserts that "she could have easily decided not to appeal the denial" of her claim for SSDI benefits had she known that the LTD benefits she received under the Plan would be reduced by the amount of SSDI benefits awarded to her children (Pl.'s Mem. 13), but she has adduced no evidence that she was injured by her decision to seek SSDI benefits.  Plaintiff's decision to seek SSDI benefits, payment of those benefits by SSA, and subsequent reduction of LTD benefits under the Plan plainly did not cause Plaintiff to receive any less money in benefits than she would have received had she never applied for SSDI benefits.  *Cf. Derin v. First UNUM Life Ins. Co.*, 558 F. Supp. 2d 437, 443 (S.D.N.Y. 2008) (noting that, after deduction of SSDI awards, the "plaintiff continues to receive [the benefit] his employer bargained for," with the "only difference" being that "more of that [benefit] is paid for by the Government and less by the insurer").  In fact, as Defendants point out, Plaintiff is better off for having applied for and received SSDI benefits, because the Policy authorizes First Unum to deduct from Plaintiff's LTD benefits only the amount of her original

---

[8] Plaintiff's claim that the 2002 Resource Guide is misleading — because its statement that "your benefits from the LTD Plan generally will be reduced by the amount of Social Security disability benefits you receive" implicitly excludes family benefits — is open to serious question.  On its face, that sentence does not exclude family benefits paid to the primary beneficiary.  Indeed, SSDI benefits related to dependent children are paid to the primary beneficiary.  Thus, it is far from clear that the 2002 Resource Guide is inconsistent with, let alone can be fairly read to modify, the 1997 SPD.

SSDI awards; it is undisputed that Plaintiff's total disability benefits have increased with the COLA increases to her SSDI benefits.  (First Unum 56.1 ¶¶ 39-41.)  Moreover, Plaintiff chose to appeal the denial of the SSDI benefits after receiving the May 2, 2003 letter in which Plaintiff was told about the family SSDI offset, and after she executed the Reimbursement Agreement, which also explained the offset requirements.

Therefore, Defendants are entitled to summary judgment as to Plaintiff's claims of breach of fiduciary duty.

### D.  Promissory Estoppel Claim

Plaintiff claims that she "reasonably and detrimentally relied on Defendants' misrepresentations by appealing the denial of her children's Social Security benefits," and that Defendants are therefore "liable in promissory estoppel pursuant to the federal common law of ERISA."  (SAC ¶¶ 38, 40.)

"A plaintiff must satisfy four elements to succeed on a promissory-estoppel claim:  (1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced."  *Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst.*, 404 F.3d 167, 172 (2d Cir. 2005) (internal quotation marks omitted).  "Additionally, an ERISA plaintiff must adduce not only facts sufficient to support the four basic elements of promissory estoppel, but facts sufficient to satisfy an extraordinary circumstances requirement as well."  *Id.* at 172-73 (internal quotation marks omitted).

For essentially the reasons stated above, *see supra* Sections II.B and II.C, Defendants are entitled to summary judgment on Plaintiff's promissory estoppel claim.  The 2002 Resource Guide was not a promise to Plaintiff that her LTD benefits would not be offset by SSDI family

benefits, the May 2, 2003 letter explained the SSDI family offset obligations, and, in any event,
there was no injury to Plaintiff caused by her application for SSDI benefits (the action she claims
to have taken in reliance on this "promise").

    E.  Attorneys' Fees

        In light of the Court's conclusion that Defendants are entitled to summary judgment as to
all of Plaintiff's claims,[9] the Court must consider whether to award Defendants attorneys' fees.

        "In any action [brought] under [ERISA] . . . by a participant, beneficiary, or fiduciary, the
court in its discretion may allow a reasonable attorney's fee and costs of action to either party."
29 U.S.C. § 1132(g)(1).  "The determination whether to 'allow' an attorney's fee under ERISA
requires the court to weigh five factors:  (1) the degree of the offending party's culpability or bad
faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an
award of fees would deter other persons from acting similarly under like circumstances, (4) the
relative merits of the parties' positions, and (5) whether the action conferred a common benefit
on a group of pension plan participants."  *LaForest v. Honeywell Int'l Inc.*, 569 F.3d 69, 74 (2d
Cir. 2009) (quoting *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d
Cir. 1987)).  As the Second Circuit has noted, "courts have cautioned that the five factors very
frequently suggest that attorney's fees should not be charged against ERISA plaintiffs."
*Salovaara v. Eckert*, 222 F.3d 19, 28 (2d Cir. 2000) (internal quotation marks omitted).  "For
example, courts have found that the culpability of a losing plaintiff significantly differs from that

---

        [9] The Court notes that the JPMC Defendants have advanced alternative arguments for
summary judgment, e.g., that Plaintiff released her claims against JPMC.  (JPMC Mem. 5-7.)
Because all Defendants are entitled to summary judgment in full for the reasons discussed above,
the Court need not consider these other arguments.

of a losing defendant:  A losing defendant must have violated ERISA, thereby depriving plaintiffs of rights under a pension plan and violating a Congressional mandate.  A losing plaintiff, on the other hand, will not necessarily be found culpable, but may be only in error or unable to prove his case."  *Id.* (internal quotation marks omitted).  However, attorneys' fees may be charged against ERISA plaintiffs in appropriate circumstances.  *See, e.g.*, *Seitzman v. Sun Life Assurance Co.*, 311 F.3d 477, 485 (2d Cir. 2002) (affirming award of attorneys' fees to ERISA defendant where plaintiff "presented testimony that was found to be deliberately false as to the most material points, in a trial context that reflected other statements by him on material matters that were at best misleading").

Defendants contend that attorneys' fees should be charged against Plaintiff principally because Plaintiff prosecuted this lawsuit in bad faith.  According to Defendants, "when the evidence showed that plaintiff's professed beliefs were objectively false, she changed her story, and claimed that she really believed something else."  (Mem. of First Unum in Supp. of Mot. for Summ. J. ("First Unum Mem.") 14.)  Plaintiff responds that her changed story merely reflects "that her recollection might have been inaccurate."  (Pl.'s Mem. 21.)

Defendants marshal the following facts in support of their claim:  Plaintiff participated in the Plan beginning in 1988, "voluntarily contribut[ing] to payment of premiums . . . through the end of her employment in 2002."  (SAC ¶ 10.)  Plaintiff became disabled in August 2002.  (*Id.* ¶ 11.)  In Plaintiff's March 31, 2006 letter to First Unum, she stated that "[w]hen [she] elected Long-Term Disability coverage from [JPMC], [she] had no knowledge of requirements other than those included in the Summary Plan Document [sic]," in which "*nothing* is stated about an offset of Social Security disability benefits to a disabled employee's children," and that she

"relied on the Summary Plan Document [sic]."  (R. 417.)  In other words, Plaintiff claimed that

when she chose to participate in the Plan, she believed that the amount of SSDI awards paid to

her children would not be deducted from her LTD benefit because of the provisions in the 1997

SPD.  Plaintiff's counsel made a similar representation to First Unum in his letter of December

12, 2006 appealing First Unum's determination of Plaintiff's claim, stating that while Plaintiff

was "voluntarily contribut[ing] [to] the cost of her LTD benefits," she "believ[ed] that if she

obtained them, any Social Security offset would apply only to the benefit she received, not to

dependent benefits received by her children."  (R. 287 (second brackets in original).)  Plaintiff's

original Complaint also alleged that she "pa[id] long-term disability premiums based upon the

belief that her long-term disability benefits would not be offset by Social Security benefits

received by her children."  (Compl. ¶ 25.)  However, Plaintiff's Second Amended Complaint

omits this allegation, and concedes that "the offset against long term disability benefits . . . at one

time had applied to Social Security benefits received by the individual, their spouse and their

depend[e]nts," arguing instead that this provision had been modified by the 2002 Resource

Guide, which Plaintiff received on or about December 23, 2002.  (SAC ¶¶ 13-14.)  Thus,

Plaintiff now admits that prior to December 2002 — i.e., during her employment at JPMC, when

she was paying LTD premiums — she did not have reason to believe that her LTD benefits

would be unreduced by SSDI family benefits.  Plaintiff does not explain the discrepancy other

than to state that "Plaintiff's recollection of the SPDs . . . may have been inaccurate."  (Pl.'s

Mem. 21.)

        Defendants contend that this admission demonstrates that Plaintiff never actually had a

good-faith belief that her LTD benefits were safe from offset by SSDI family benefits, and that

she never relied on such a belief in choosing to participate in the Plan and pay premiums. Specifically, Defendants argue: "Plaintiff has made admissions . . . about what she actually believed, and what actions she actually took based on those beliefs. Then she disavows what she previously claimed to have believed, and asserts that she believed something entirely different. This is bad faith." (First Unum Mem. 16-17.) Defendants' argument is not without force, and is more persuasive than Plaintiff's arguments on the merits of her ERISA claims. However, while Plaintiff has now acknowledged that, prior to 2002, the Plan specified that SSDI family benefits would be offset, she has not disavowed her position that she formerly believed to the contrary. Although Plaintiff does not explain why she incorrectly believed with such conviction that "*nothing* is stated [in the Plan documents] about an offset of Social Security disability benefits to a disabled employee's children," it is at least theoretically possible that Plaintiff simply misread the Plan documents in this manner. The Court therefore declines to find that Plaintiff has made "deliberately false" representations and that she has acted in bad faith. *See Critelli v. Fidelity Nat'l Title Ins. Co.*, 554 F. Supp. 2d 360, 367 (E.D.N.Y. 2008) ("The egregiousness of the plaintiff's conduct in *Seitzman* is a far cry from Plaintiff's pressing an ERISA claim in the case now before this Court."). Because none of the other four *Chambless* factors weighs particularly heavily against Plaintiff, the Court exercises its discretion to deny Defendants' motions for attorneys' fees.

### III. Conclusion

For the reasons stated herein, Defendants' motions for summary judgment are granted, and their motions for attorneys' fees are denied. The Clerk of Court is respectfully directed to terminate the pending motions (Dkt. Nos. 48, 57), to enter judgment for Defendants, and to close this case.

SO ORDERED.

Dated:        September 30, 2009
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

23

Service List (By ECF):

William D. Frumkin, Esq.
Sapir & Frumkin LLP
399 Knollwood Road, Suite 310
White Plains, NY  10603
Wfrumkin@sapirfrumkin.com

Philip A. Goldstein, Esq.
Stacey L. Blecher, Esq.
J.P. Morgan Chase & Co.
Legal Department
1 Chase Manhattan Plaza, 26th Floor
New York, NY  10005
susan.mcnamara@chase.com

Patrick W. Begos, Esq.
Begos & Horgan LLP
327 Riverside Avenue
Westport, CT  06880
pwb@begoshorgan.com